IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUL - 2 2014

CLERK, U.S. DISTRICT COURT
By _____
Deputy

BRANDON RAY SMITH,      §
     §
         Petitioner,      §
     §
v.      §
     §
WILLIAM STEPHENS, Director,[1]      §
Texas Department of Criminal      §
Justice, Correctional      §
Institutions Division,      §
     §
         Respondent.      §

No. 4:13-CV-101-A
(Consolidated with
No. 4:13-102-A)

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Brandon Ray Smith, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ, respondent. After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

---

[1]William Stephens succeeded Rick Thaler as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Director Stephens "is automatically substituted as a party." *See* Fed. R. Civ. P. 25(d).

## A. FACTUAL AND PROCEDURAL HISTORY

The state appellate court summarized the procedural and factual background of this case as follows:

> A grand jury indicted Appellant for two counts of aggravated assault with a deadly weapon. The indictments collectively alleged that Appellant intentionally or knowingly threatened imminent bodily injury to Gary and Randolph (Randy) Osburg and that Appellant used or exhibited a truck as a deadly weapon during the commission of the assaults. The indictments also alleged that Appellant had a previous felony conviction. Appellant pleaded not guilty to both counts, was tried in October 2008, and the jury found [him] guilty of both counts. During the punishment phase of his trial, Appellant pleaded true to the repeat offender notice in the indictments. The jury found the enhancement to be true and assessed Appellant's punishment at thirteen years' confinement for each count; the trial court ordered Appellant's sentences to run concurrently. . . .

> Randy Osburg testified at trial that he took his son, Gary Osburg, to a convenience store in Tarrant County, Texas, on February 11, 2008, to buy some cigarettes. As they were leaving the store, Randy and Gary saw Appellant and his female companion, Banu Kurt, involved in what they believed was an altercation; they saw Appellant hit Ms. Kurt twice in the chest with a closed fist. After the second hit, Ms. Kurt moved backward, hit the gas pump, and fell down. Sitting in Appellant's truck were two children Randy believed were between three and six years old; one of them was crying.

> Gary further testified that, upon seeing the second hit, he got out of Randy's truck to help Ms. Kurt and to confront Appellant. As Gary approached Appellant, Appellant pulled brass knuckles from his pocket and told Gary to mind his own business. Gary and Randy started "mov[ing] around" Appellant, and

2

although they did not "jump on" him, Appellant ran around the building and away from them.

Randy yelled for someone to call the police, and Appellant jumped into his truck and "acted like he was going to leave." Randy started talking to Ms. Kurt, but something in Ms. Kurt's expression made Randy turn around. Randy then saw Appellant driving straight at him. When Randy heard Appellant accelerate, Randy jumped into the bed of Gary's truck; Randy testified that he was afraid of dying or being badly hurt. Appellant then circled the gas pump and drove straight at Gary; Gary testified that he believed Appellant was trying to kill him, and Randy testified that he was afraid Appellant was going to kill Gary. When Gary saw Appellant driving at him, he grabbed a hammer from Randy's truck and threw it at Appellant, hitting the truck's windshield. Appellant slammed on the brakes, got out of his truck "in a complete rage," and ran after Gary while his truck was still moving. Appellant's unoccupied truck rolled across the street and came to rest against a sign and a telephone pole.

Appellant then chased Gary around the convenience store on foot. Gary came out from the back of the convenience store and got into Randy's truck, and Gary and Randy drove away from the store. Appellant ran across the street to his truck and followed Gary and Randy. Randy testified that he drove away from the convenience store and turned right on a street two or three blocks away. As he and Gary approached a stop sign after turning right, Gary said, "He's behind us. He's going to ram us." Randy looked in his mirror and saw Appellant's truck "coming at [them] fast."

Randy said that he accelerated and "got maybe a little bit across the street when Appellant hit us." Randy testified that he accelerated again and believed he was driving sixty or seventy miles-per-hour when Appellant "rammed [him] two or three more times." Randy testified that Gary had retrieved his hammer from the convenience store parking lot and was leaning out the truck window as they drove to throw the hammer at

3

Appellant "to slow him down."  Randy also testified
that he was afraid Appellant would push them into
traffic at an upcoming intersection.  Randy said that
he then slammed his brakes and that Appellant also
slammed his brakes, avoiding a collision.  When traffic
on the cross-street was clear, Randy accelerated again
but Appellant approached them in the outside lane.
Gary said, "He's going to ram you," and Randy again
slammed his brakes.  Randy testified that Appellant
"ended up going across our lane, trying to ram us from
the side, but luckily, he just barely missed me."
Randy said that Appellant's truck crossed some railroad
tracks, "went into the air," and stopped in a ditch.

Gary testified that he was scared and his
adrenaline was going when they drove away from the
convenience store.  Gary testified that while Randy
drove, Gary looked out the window and saw Appellant get
into his truck and follow them.  Gary said less than
fifteen seconds passed before Appellant "was already up
on us," tailgating them.  Gary testified that Appellant
"ended up striking" the rear of Randy's truck three
times, jarring Randy and Gary.  As Randy approached a
T-intersection, Randy turned right and Appellant
followed.  Gary testified that he "saw Appellant coming
up on us really fast and I told my dad to get over into
the next lane and stop and hit his brakes.  And when he
did, Appellant was coming at us, barely missed us, and
went into a ditch."

Randy testified that after Appellant drove into
the ditch, he and Gary drove back to the convenience
store, hoping the police had arrived by that time.  The
police were there and noted damage to the bumper on
Randy's truck, but no photographs were taken.  Randy
said he was somewhat able to repair the dent in the
bumper by tying it to a tree and pulling it out.  The
police also noted front-end damage to Appellant's
truck, but the officer did not recall noticing any
damage to the windshield.

During cross-examination, Randy acknowledged that
he had joked with someone after the altercation that he

would gladly have the case dropped and all charges
dismissed if Appellant would meet Gary for a one-on-one
fight.   Randy also admitted that he "forgot" to tell
the jury that he also had a weapon during the
altercation—a tile cutter he had gotten from the bed of
his truck.

Tricia Nyamongo Walton, the clerk from the
convenience store, testified that she saw Appellant, a
woman, and two other men standing behind a white truck.
She saw Appellant drive the white truck around the
store, and she told police that Appellant was "driving
crazy," almost ran into the building, the gas pumps,
and her car.   She also told police that Appellant
chased the other men with his truck.

Ms. Kurt testified for the defense that she and
Appellant were not fighting but were instead "just
playing around."   She said that Appellant pushed her
but that she tripped over the gas pump.   Ms. Kurt did,
however, tell the police that Appellant hit her in the
face.   She testified that as Randy and Gary approached
Appellant, she gathered her children, ages ten and
eight, and went into the convenience store.   She said
that she did not see what was thrown at Appellant's
truck but that she did see damage to the windshield.
She also testified that she did not see Appellant drive
toward anyone.

Op. 120-25, *Ex parte Smith*, No. WR-78,214-01, ECF No. 15-3.

The appellate court affirmed the trial court's judgments,

and the Texas Court of Criminal Appeals refused petitioner's

petitions for discretionary review.   *Smith v. State*, PDR Nos.

1142-10 & 1143-10, ECF Nos. 13-1 & 14-6.   Petitioner also filed a

state habeas application relevant to this federal petition, which

was denied by the Texas Court of Criminal Appeals on the findings

and conclusions of the trial court without written order.[2]

Order, *Ex parte Smith*, No WR-78,214-01, ECF No. 16-3.

## B.   ISSUES

Generally, petitioner raises the following grounds for relief:

(1)   He received ineffective assistance of trial counsel;

(2)   The trial court abused its discretion in refusing to appoint new counsel;

(3)   The trial court violated his professional code by allowing a certain voir dire member to serve as a member of the jury;

(4)   He received ineffective assistance of appellate counsel; and

(5)   He is actually innocent of the offense.

Pet. 7-8A, ECF No. 1; Pet'r's Mem. of Law 2-4, ECF No. 2.

## C.   RULE 5 STATEMENT

Respondent believes that petitioner has sufficiently exhausted his state court remedies as to the claims presented, although he believes one is procedurally barred, and that the petition is neither barred by limitations nor successive.  Resp't

---

[2]The Texas Court of Criminal Appeal adopted the trial court's findings and conclusions of law, except for finding #34, which reads "Mr. Pearson did not file a motion for change of venue because he found factual basis for a change of venue." Findings of Fact 98, ECF No. 16-4.

Ans. 7, ECF No. 21.

### D.   DISCUSSION

*Legal Standard for Granting Habeas Corpus Relief*

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA).   Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court.   *Harrington v. Richter,* 131 S. Ct. 770, 785 (2011); 28 U.S.C. § 2254(d)(1)-(2).   This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."   *Harrington,* 131 S. Ct. at 786.

The Act further requires that federal courts give great deference to a state court's factual findings.   *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).   Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.   The applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).   Typically, when the Texas

7

Court of Criminal Appeals denies relief in a state habeas corpus application without written order, it is an adjudication on the merits. *Barrientes v. Johnson*, 221 F.3d 741, 779-80 (5th Cir. 2000); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

In this case, the state habeas court entered express findings of fact refuting petitioner's claims, which he has failed to rebut with clear and convincing evidence, and the Texas Court of Criminal Appeals adopted those findings, save for one, and denied habeas relief without written order. Order 1-2, *Ex parte Smith*, NO. WR-78,214-01, ECF No. 16-3. Under these circumstances, a federal court must defer to the state habeas court's factual findings and may assume the Texas Court of Criminal Appeals applied correct standards of Supreme Court precedent to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[3]; *Catalan v. Cockrell*, 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

---

[3]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.3d 327, 330 n.2 (5th Cir. 1981).

8

### (1) Ineffective Assistance of Trial Counsel

Under his first and fourth grounds, *see infra,* petitioner claims he received ineffective assistance of court-appointed trial and appellate counsel.  Petitioner was represented by David A. Pearson IV at trial and by Lisa Mullen on appeal.

A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right.  U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967).  An ineffective assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*.  466 U.S. at 668.  *See also Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective assistance claims against appellate counsel).  To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 688.

A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional

9

assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689; *Harrington*, 131 S. Ct. at 788. Where, as here, a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the standard set forth in *Strickland.* *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Santellan v. Dretke*, 271 F.3d 190, 198 (5th Cir. 2001). The Supreme Court recently emphasized in *Harrington* the way that a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 131 S. Ct. at 785 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)).

Petitioner claims trial counsel was ineffective because he—

(1)   failed to investigate the scene, take photos of the alleged crime scene, tire tread marks, or otherwise pursue evidence to contradict the complainants' testimony as to what happened,

(2)   failed to secure convenience store surveillance video of the alleged crime, to produce the video or to subpoena it for trial,

(3)   failed to locate and interview crucial witness whose testimony would have contradicted what the complainants testified to at trial,

(4)   refused to let him testify at trial,

(5)   failed to investigate a possible conspiracy against him where it's possible he was set-up or framed by a certain individual,

(6)   failed to file a motion for change of venue,

(7)   failed to inquire further of a venire member who knew and/or worked for the prosecutor, whom the prosecutor knew would be unfair and biased,

(8)   failed to investigate, interview and call witnesses, subpoena evidence, destroyed the only defense he had that would have more fully advanced his defense, and

(9)   failed in doing all of the above.

Pet. 7-8A, ECF No. 1.

Trial counsel, who is board certified in criminal law, filed an affidavit and supporting documentation in the state habeas

proceeding responding to petitioner's allegations in relevant

part as follows:

    Smith contends that Counsel was deficient for
failing to locate or interview the witness, Josh Smith.
Counsel knew that Josh Smith was an important witness
to interview.  Counsel knew about Witness Smith from
multiple discussions and written statements from
Applicant Smith.  Applicant Smith wrote to Counsel, "I
have witnesses.  A man named Josh Smith and his wife
were standing outside on their porch when I was ran off
the road. . .  Josh Smith's phone #(817)903-9530."
Counsel directed the private investigator, Jane
Brownlee, who was appointed to assist me, to call Josh
Smith and interview him.  Counsel first called Josh
Smith and spoke to him and verified that the phone
number given to me was correct.  Counsel determined
from my interview with Josh Smith that neither he nor
his wife witnessed what Applicant Smith suggested they
witnessed.  Josh Smith did not see Applicant in any way
forced off the road by the complainants.  Witness Smith
saw Applicant's vehicle in the roadside and nothing
more.  Counsel determined that Josh Smith was not
helpful, and, in my estimation, he would serve to
corroborate the complainants' account.

    Nonetheless, I still directed the private
investigator to interview Witness Smith in abundance of
caution as to whether he had not been forthcoming with
me.  Jane Brownlee met with Josh Smith at his house and
together they drove to the spot on the road where
Applicant Smith's vehicle wrecked into a roadside
ditch.  Brownlee reported to me after the interview
that Witness Smith was not helpful to our defense, and
that he was reluctant to be questioned and especially
reluctant if forced to testify.

    Smith contends that Counsel was deficient for
failing to investigate the crime scene and pursue
evidence contradicting complainant's testimony.
Counsel drove to the offense location and inspected the
convenient store and the parking lot for any helpful

evidence.  Counsel did not discover "tire markings" in
the parking lot that were linked to the offense.  In
fact, Counsel recalls from the trial that he
specifically impeached the investigating officers for
failing to recover or photograph evidence of tire
marking.  Counsel then argued to the jury this failure
to properly investigate as a basis for reasonable
doubt.

     At his inspection of the offense location, Counsel
stood inside the store to observe the offense location
in the parking lot to gain the perspective of any
witness who observed the incident from inside the
store.  Besides the offense location, Counsel also
observed where the Applicant's vehicle was wrecked and
observed and noted the distance from the offense
location to Applicant's home where he was arrested on
the incident date.  Counsel's file contains MapQuest
printed directions and a note referencing time spent
driving to various locations related to the offense.  .
. .

     Counsel also directed private investigator to
interview the store clerk, Tricia Nyamongo, who was
named "Witness 1" in the offense report.  Counsel did
this specifically because "Witness 1" supposedly saw
everything, and Counsel wanted to check whether her
story had been embellished by the police report.
Counsel directed the interview with her because Counsel
wanted to know if there was any chance that the Witness
had been influenced by the police or the complainants
after they returned to the convenience store/gas
station.  Counsel specifically wanted to discover if
"Witness 1" could in fact tell us if the complainants
were in any way the aggressive or assaultive actors in
the incident.  Brownlee was successful in interviewing
"Witness 1" and unfortunately discovered that her
account would be extremely harmful to the defense.
Brownlee provided a report to Counsel regarding her
interview with "Witness 1".

     Smith contends that Counsel was deficient for
failing to secure surveillance videotape of the alleged

13

crime.  Counsel sought out any and all available
photographic, digital, or physical extant evidence,
including surveillance of the alleged incident.  First
of all, Tarrant County District Attorney's Office has
an open file policy.  It has always been Counsel's
experience that the Tarrant DA Office is willing to
share any extant case-related photographic or media
evidence, including surveillance footage.  Counsel
inquired of the prosecutors handling the case whether
all photographic, digital or recorded evidence had been
provided.  Counsel does not believe that any
surveillance footage existed.  Second, Counsel's
request for "recordings and transcriptions thereof of
all information and evidence obtained by means of
electronic eavesdropping, surveillance, . . ." was
filed, heard and granted in his *Motion for Discovery*,
subparagraph 17.

Smith contends that Counsel was deficient for
refusing to allow Smith to testify.  This statement by
Smith is false.  Counsel explained to Smith that the
privilege to testify or choose not to testify is his
individual right guaranteed by the United States
Constitution.  Counsel explained to Smith that his
decision whether or not to testify at either the
guilt/innocence phase or punishment phase would be
honored.  Counsel stressed to Smith that Smith's right
to testify could not be overridden by any opinion of
his lawyer.  Counsel had practiced for over 17 years at
the time of Smith's trial, nearly exclusively in
criminal defense.  Counsel has tried many cases in his
career and never once failed to appreciate, advise, and
respect a client as to his or her personal choice on
whether he or she testified in their own defense.

Smith contends that Counsel was deficient for
failing to investigate a possible conspiracy against
him.  Counsel discovered no potentially credible basis
to believe a conspiracy existed that resulted in
Smith's arrest or prosecution.  Counsel had no credible
basis to believe that a financially motivated third
party had the means or opportunity to somehow generate
motivation and collusion on the part of the

complainants and the store clerk to falsely report an
offense and commit perjury in court.  Further, Counsel
had no credible basis to believe a fabricated criminal
prosecution against Smith in particular could somehow
lead to a potential financial gain for this third
party.

Smith contends that Counsel was deficient for
failing to present all evidence helpful to the defense.
Counsel believes the trial record supports that he
presented all available evidence helpful to the
defense.  Counsel located a witness, J. Kirk Fraley,
who provided information Counsel used in trial to
impeach the complainant, Randy Osburg.  Randy Osburg
made the statement to Fraley that he would drop the
charges if Applicant Smith would meet him to fight one
on one.

Counsel also attained a written statement from
Banu Kurt, Smith's girlfriend who at the scene wrote a
statement for police that, "Smith hit me on the face
and 2 men started to fight with him to help."  Smith
directed his private investigator to interview Banu
Kurt, who Counsel understood was ready to give a
version more supportive of Smith.  Banu Kurt did give a
statement that was helpful to the defense.
Consequently, Counsel called Kurt as a witness for
Smith, and Kurt did testify that Smith and she were
only playing around, and he had not assaulted her as
suggested by the complainants.  Kurt also testified
favorably that she did not see Smith drive his vehicle
toward anyone.

Counsel also presented evidence helpful to Smith
in the punishment phase by calling a witness who
testified to Smith's good work habits and skills.
Counsel recalls that he called Robert Thomas of Three
Way Fence/Three Way Welding.  Thomas touted Smith's
work ethic, that Smith had achieved a welder's
certificate, and that he valued Smith as an assistant.
Smith was a repeat offender, who faced 5-99 years or
lifetime confinement.  He received thirteen (13) years,
a punishment in the lower range, which Counsel believes

was due in part to the mitigating evidence presented.

Smith contends that Counsel was deficient for making statements implying his belief in Smith's guilt. This is a false statement. It is not Counsel's role to decide "guilt", that is the job of the Judge or a Jury. Counsel had several discussions with Smith regarding Counsel's understanding from his own investigation of the evidence we could expect to hear and see at trial. Counsel believes he fulfilled his obligations with Smith to fully discuss all the facts and circumstances regarding the case. Counsel also discussed the case with Smith and received Smith's written summaries of alleged witness accounts, in order to understand Smith's version of the incident. Counsel exhaustively sought out all evidence he could establish that might support Smith's version.

Smith contends that Counsel was deficient for failing to inquire further about a venire member who knew the prosecutor. The venire member worked at a law firm with Assistant District Attorney Kirk Stallings. Undersigned Counsel recalls this exact exchange with this venire member but did not believe her statements yielded sufficient potential basis, even on further questioning, for a challenge for cause. However, in order to protect Smith against the potential bias from this venire member, Counsel utilized a peremptory challenge to prevent her from serving on the jury.

Undersigned Counsel does not believe he was ineffective in preparing to try or in trying this lawsuit.

Aff. 67-74, ECF No. 16-4.

The state habeas court found counsel's affidavit credible and supported by the record and entered detailed findings consistent with the affidavit. Findings of Fact 95-102, ECF No. 16-4. Based on those findings, and applying the *Strickland*

16

standard, the court concluded that counsel adequately and independently investigated the case, fully and adequately prepared for trial, made reasonable decisions regarding the calling and examination of witnesses and regarding the voir dire examination, and functioned as counsel guaranteed by the Sixth Amendment. The court further concluded that no grounds existed for counsel's removal and that, even if petitioner could show deficient performance, he had failed to show a reasonable probability that, but for counsel's acts of misconduct, the result of his trial would have been different. Conclusions of Law 102-03, ECF No. 16-4.

Petitioner presented no argument or credible evidence in state court or this federal habeas action that could lead the court to conclude that the state courts unreasonably applied *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). Petitioner's claims are largely conclusory or speculative with no legal or evidentiary basis, contradicted by the record, or involve strategic decisions by counsel, which are either insufficient to raise a constitutional issue and/or outside this court's preview on federal habeas review. *See Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not

provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (providing "[c]laims of uncalled witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain"); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) (holding conclusory arguments are insufficient to support claim of ineffective assistance); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (providing "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial").

Overall, trial counsel devised a defense, filed pretrial motions and participated in pretrial hearings, conducted voir dire, gave opening argument, made meritorious objections and motions during trial, cross-examined state witnesses, and gave closing argument. A petitioner is required to demonstrate that counsel's performance, in light of the entire proceeding, was so

18

inadequate as to render his trial unfair. *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981). Having reviewed the entirety of the record, counsel's performance was not outside the wide range of professionally competent assistance.

### *(2) and (3) Trial Court Error*

Petitioner claims the trial court abused its discretion by refusing to appoint new counsel where there was a conflict between him and his trial counsel. Pet. 7, ECF No. 1; Pet'r's Mem. of Law 20-21, ECF No. 2. The record reflects that shortly before his trial was to commence, petitioner sent a letter to the trial judge wherein he asserted-

> I am writing because I would like to fire my attorney (David Pearson). Mr. Pearson and I have major conflicts of interest concerning my cases (2 agg. assaults). I have asked him again and again, since day one, to file a certain couple of motions and he has yet to produce any paperwork whatsoever. I am starting to feel he himself is out to get me. He tells me that yes, he did in fact file those motions that I asked for back in June but just keeps on forgetting to give me the paperwork that I desperately need in order to be able to help defend my cases. I feel utterly and completely exhausted in this battle of attorney verse [sic] client. Can you please find it in your heart to help me out in this matter. I need an attorney that will help me. Thank you very much!

Clerk's R. 71-73, ECF No. 16-2.

In response to the letter, counsel filed a motion to withdraw on October 20, 2008, two days before trial. Clerk's R.

19

71, ECF No. 16-2; Reporter's R. vol. 2, ECF No. 14-4.  At the
hearing on the motion, petitioner stated to the court that he and
counsel "had disagreements from day one, where there's a
communication barrier and breakdown," that "there were some trust
issues involved," that there was "a whole bunch of issues that
have come into play," and that he had asked counsel "to check on
these people's criminal records and stuff like this way back at
the beginning of all this."  Petitioner stated he also felt that
the trial "had been kind of rushed" and that "when it comes to my
case, maybe [counsel] hasn't had time, maybe he's been busy, or,
I don't know, I don't know what the situation is.  I just feel
that, you know, he hasn't been able to give my case the time . .
. ."  *Id.* at 12-13.  The trial court explained that petitioner's
"feelings" were irrelevant, and, absent any legal or factual
basis warranting "removal" of counsel, denied counsel's motion to
withdraw.  *Id.* at 30.  The state habeas court also found that
there was no factual basis for removal of counsel and, given that
"[n]o grounds existed for the removal," recommended denial of the
claim.  The Texas Court of Criminal Appeals denied relief on the
trial court's findings.  Findings of Fact and Conclusions of Law
102-74, ECF No. 16-4; Order 1-2, ECF No. 16-3.

Petitioner presented no credible evidence that trial

20

counsel's representation was deficient due to an actual conflict

or that petitioner was prejudiced by any conflict.   An "actual

conflict," for Sixth Amendment purposes, is a conflict of

interest that adversely affects counsel's performance.   *Mickens*

*v. Taylor,* 535 U.S. 162, 172 n.5 (2002).   Petitioner contends-

> appointed attorney refused to do anything he asked him, to
> investigate his case, interview Josh Smith and call him to
> the trial, wouldn't agree to let the Applicant testify on
> his own behalf, failed to establish a working relationship
> with him, implied the Applicant was guilty, wouldn't try to
> obtain the store video of the entire alleged assault, there
> was a failure to listen to the Applicant at all in regards
> to how Applicant wanted the appointed attorney to conduct
> his case.

Pet'r's Mem. of Law 21, ECF No. 2.

Such conclusory allegations, unsupported in, or refuted by,

the record, are insufficient to establish adverse performance by

counsel.   *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).

A defendant's mere dissatisfaction or disagreement with his

attorney's strategy does not give rise to a conflict.   *United*

*States v. Fields,* 483 F.3d 313, 353 (5th Cir. 2007); *Moreno v.*

*Estelle,* 717 F.2d 171, 175 (5th Cir. 1983).   Nor does the Sixth

Amendment right to counsel guarantee an accused a "meaningful

attorney-client relationship."   *Morris v. Slappy,* 461 U.S. 1, 14

(1983).   Because petitioner failed to establish a conflict that

adversely affected counsel's performance, there was no abuse of

discretion on the part of the trial court.

Petitioner also claims the trial court violated its "Professional Code" by allowing a "voir dire member" who had a prior working relationship with the state prosecutor to serve on the jury. Pet. 7, ECF No. 1. Respondent asserts this claim was not raised on direct appeal by petitioner and, thus, was procedurally defaulted in state court and, in turn, is procedurally barred on federal habeas review. Resp't's Ans. 17-18, ECF No. 21. The state habeas court, however, did not expressly rely on the procedural bar when addressing the issue. Findings of Fact and Conclusions of Law 104-05, ECF No. 16-4. Nevertheless, the potential juror in question did not serve on the jury because trial counsel exercised a peremptory challenge against her. Findings of Fact and Conclusions of Law 104-05, ECF No. 16-4. Therefore, this claim is factually incorrect and frivolous.

### (4) Ineffective Assistance of Appellate Counsel

Petitioner claims appellate counsel was ineffective by failing to raise on appeal the claims he presents herein, points of error he asserts would have entitled him to a reversal of his conviction, and by failing to discuss the evidence and refer to the record in greater detail. Pet. 8 , ECF No. 1; Pet'r's Mem.

22

of Law 25-26, ECF NO. 2.  Appellate counsel responded to the

allegations in her affidavit as follows:

> Pursuant to the allegations in the Writ of Habeas
> Corpus . . ., I am providing the following information:
>
> I aggressively and diligently represented Mr.
> Smith in his appeal and used my best legal judgment and
> strategy throughout the appellate proceedings.  I
> raised every legal attack that was preserved and had a
> legal basis to raise.  I, as I do in every appeal case,
> read the entirety of the record three times to discern
> any errors or develop any legal challenges to his
> trial.  I raised every legal challenge that was
> preserved and that had a basis in argument and law in
> my brief.
>
> Specifically, Applicant challenges the fact I did
> not raise ineffective assistance of counsel on the
> direct appeal.  I specifically did not raise this issue
> on appeal as the law is very clear that, to win such an
> argument, the record must demonstrate trial counsel's
> explanation and possible strategic motivation for his
> trial conduct.  This record does not reflect this so we
> could not win this claim on direct appeal.  This fact
> was explained to Applicant many times.  To raise it and
> loose [sic] it would also constitute waiver of the
> issue which could be attacked on a writ, so I was
> actually trying to protect Applicant in not raising
> this issue.
>
> Applicant also complains that I did not raise the
> issue of trial counsel not challenging for cause a
> specific juror.  If trial counsel did not challenge the
> juror, I obviously could not win this issue on appeal
> as it was not preserved.  When an issue is not
> preserved, I will not raise it on appeal.
> In summary, in Mr. Smith's appeal, I raised every
> issue that I, in my best legal judgment, fact and law
> as a possible point of error on appeal.

Aff. 90-91, ECF No. 16-4.

The state habeas court found counsel's affidavit credible and supported by the record and entered findings consistent with the affidavit, including findings that counsel directed the appellate court to the appropriate record citations and pertinent state law and that counsel's decisions as to the issues to raise and not to raise on appeal was a matter of reasonable professional judgment. Based on those findings, and applying the *Strickland* standard, the court concluded that appellate counsel provided petitioner with effective assistance on appeal. The court further concluded that there was no reasonable probability that the outcome of the appeal would have been different had counsel or another counsel handled it differently and recommended relief be denied. Findings of Fact and Conclusions of Law 106-09, ECF No. 16-3. The Texas Court of Criminal Appeals denied relief based on the trial court's findings.

Petitioner presented no argument or credible evidence in state court or this federal habeas action that could lead the court to conclude that the state courts unreasonably applied the standard set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). As noted by the state habeas court, appellate counsel is not required to raise every conceivable argument urged by his client on appeal, regardless of

24

merit. *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000). It is counsel's duty to choose among potential issues, according to his or her judgment as to their merits and the tactical approach taken. *Jones v. Barnes*, 463 U.S. 745, 749 (1983). Petitioner fails to raise any meritorious claims in this petition. Prejudice does not result from appellate counsel's failure to assert meritless claims or arguments. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994). Thus, it follows, that counsel was not ineffective for failing to raise petitioner's claims on appeal.

### *(5) Actual Innocence*

Finally, petitioner claims he is actually innocent of the offenses because he had a right to defend himself. The Supreme Court has not recognized actual innocence as a free standing ground for habeas relief. *United States v. Scruggs,* 691 F.3d 660, 671 (5th Cir. 2012). Thus, this claim is not an independently cognizable federal-habeas claim. *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006).

### *Evidentiary Hearing*

Petitioner requests an evidentiary hearing, however his claims were adjudicated on the merits in state court, and he has failed to overcome the limitation of § 2254(d)(1) on the record

that was before the state court.   *Cullen v. Pinholster*, — U.S. —,
131 S. Ct. 1388, 1398-1401 (2011).   Thus, no evidentiary hearing
is warranted.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,
denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate
Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases
in the United States District Court, and 28 U.S.C. § 2253(c), for
the reasons discussed herein, the court further ORDERS that a
certificate of appealability be, and is hereby, denied, as
petitioner has not made a substantial showing of the denial of a
constitutional right.

SIGNED July _2_, 2014.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE